```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
JESYCA GREENE,                           :    12 Civ. 4545 (DLC)
                    Plaintiff,           :
                                         :    OPINION AND ORDER
          -v-                            :
                                         :
ENLARGED CITY SCHOOL DISTRICT OF THE     :
CITY OF MIDDLETOWN, N.Y.,                :
                                         :
                    Defendant.           :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the Plaintiff:

Michael H. Sussman
Sussman & Watkins
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, NY 10924


For the Defendant:

Matthew J. Mehnert
Lamb & Barnosky, LLP
534 Broadhollow Road, Suite 210
P.O. Box 9034
Melville, New York 11747


DENISE COTE, District Judge:

   Jesyca Greene ("Greene") has brought this action against her former employer, the Enlarged City School District of the City of Middletown, New York ("Middletown"), alleging that her discharge was the product of discrimination on account of her

disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  On December 13, 2013, Middletown moved for summary judgment.  For the reasons set forth below, the motion is granted.

BACKGROUND

The following facts are undisputed, or taken in the light most favorable to the plaintiff.  In November 2008, Greene was hired by Middletown as a Technology Integration Coach for a "probationary" period of three years.  At or prior to the end of this probationary period, Greene would be granted or denied tenure.  The role of a Technology Integration Coach is, inter alia, to assist classroom teachers in integrating instructional technology into their curriculum, both through direct coaching and by working with administrators, department heads, and library staff.

Greene is an amputee.  Sometime prior to her employment by Middletown, she lost her left hand due to complications resulting from gastric bypass surgery.

When Greene applied for the technology coach position at Middletown, she was interviewed by Michael Tuttle ("Tuttle"), the Chief Technology Officer for Middletown, as well as by Amy Creeden ("Creeden"), who was a Technology Integration Coach at

the time.  During the interview, Green's amputation was visible to Tuttle and Creeden.  Tuttle recommended to Dr. Kenneth Eastwood ("Dr. Eastwood"), who was Superintendent of Schools for Middletown, that Greene be hired.  Dr. Eastwood in turn recommended her hiring to Middletown's Board of Education ("School Board"), and she was hired effective November 3, 2008.

During her almost three-year period of employment at Middletown, Greene developed a contentious relationship with Tuttle, who was her direct supervisor for approximately two and a half years, and with Creeden, who was initially her co-worker but who became her direct supervisor in the latter part of her third year.  While Greene received a positive evaluation from Tuttle in June 2009, her remaining evaluations from Tuttle in December 2009, March 2010, and June 2010 were unfavorable.  Greene believes that these evaluations were unfounded, at least in part, and she wrote rebuttals or objections to each evaluation.  After a meeting with Greene, her Union representative, and Tuttle, it was determined that one of the evaluations would be partially revised by Tuttle to remove a comment about Greene's future employment prospects.

The contentious relationship was not limited to Tuttle's formal evaluations of Greene.  In September 2010, Tuttle docked Greene's pay for missing a half-day of work in June 2010.  In a

3

counseling memorandum, Tuttle describes his understanding of the events giving rise to the penalty and concludes that she misled him and took advantage of his professional courtesy. Greene wrote a partial rebuttal to Tuttle's understanding of the circumstances, but agreed that her pay should be docked.

Prior to January 2011, when Creeden was to become Greene's direct supervisor, Greene considered resigning. This was due, at least in part, to her "difficult" relationship with Creeden and Greene's expectation that it would get worse. Greene did not, however, resign when Creeden became her direct supervisor.

In January 2011, Greene alleged that Creeden photographed her desk at work, that Creeden sent the photograph to Tuttle to suggest that Greene was conducting personal business at work, and that Tuttle verbally counseled her as a result. Greene suggested in her complaint that she had been subjected to harassment in violation of Middletown policy. This incident was discussed at a January 2011 meeting with Greene, her Union representative, and Dr. Eastwood. Dr. Eastwood immediately requested that Greene make a formal, written complaint. She did so on the same day, and her complaint made no mention of discrimination on the basis of disability. A formal investigation was initiated, which concluded that there had been no violation of Middletown's anti-harassment policy. Greene was

4

informed of this conclusion on March 24, 2011.

On the next day, Greene alleged that the harassment had continued and that she had been retaliated against because of her first complaint.  A formal investigation was again initiated, which concluded, in May 2011, that there had been no violation of district policy.

Between January and April 2011, Greene received unfavorable evaluations from Creeden based on classroom observations in January, March, and April 2011, as well as one from Monica Hasbrouk in March 2011.  Hasbrouk was not Greene's supervisor; she had been brought in as a neutral administrator to review Greene's work.  In the April 2011 evaluation, Creeden accused Greene of plagiarism.  The plagiarism allegation was also the subject of a counseling memorandum, in which Creeden notes that Greene was disrespectful when Creeden attempted to speak with Greene about the incident.  Separately, on April 6, when Creeden asked Greene to sign a memorandum to indicate her receipt of the document, Greene refused to do so without a union representative present and screamed at Creeden that she "was not a real administrator."

Greene wrote rebuttals to each unfavorable evaluation, asserting in essence that the material conclusions in the evaluations were unfounded or fabricated.  At no point in any of

these rebuttals did Greene allege disability discrimination.

In a meeting on April 13, Dr. Eastwood informed Greene that she was being suspended without pay due to her act of plagiarism. He further advised her that, as a result of her unsatisfactory job performance and her inability to work cooperatively with her supervisors, he was going to recommend to the School Board at its May 18 meeting that the Board terminate her employment. In the course of this meeting, Dr. Eastwood referred to Greene as a "poor woe is me type." Greene alleges that he glanced at her amputated arm as he said it. Dr. Eastwood states that his comment was a reference to Greene consistently painting herself as the victim of unfair treatment, while refusing to acknowledge the role that her own behavior had played in creating her predicament.

On April 15, Dr. Eastwood sent a four-page letter stating that Greene's lack of professionalism and growth were the reason for his recommendation for termination. To demonstrate these points, the letter lists thirteen "reasons or events," which consisted of incidents referred to in Greene's evaluations and in her file. Dr. Eastwood admitted during his deposition that he had no personal knowledge of these events and that his letter setting forth the reasons was based on the written materials in Greene's file. On May 18, the School Board voted to terminate

Greene's employment.

The present action was filed on June 11, 2012.  On December 12, it was reassigned to this Court.  A pretrial schedule was entered on January 25, 2013.  Following discovery, on December 13, Middletown moved for summary judgment.  The motion was fully submitted as of January 24, 2014.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination the court must view all facts in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on mere "allegations or denial" of the movant's pleadings.  Fed.R.Civ.P. 56(c); Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010).  "[C]onclusory

statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination "an extra measure of caution is merited in affirming summary judgment" because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  Nonetheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).  Ultimately, the test for summary judgment "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Greene challenges her discharge as the product of discrimination on the basis of disability, in violation of the ADA.  The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to [inter alia] . . . discharge of employees."  42 U.S.C. § 12112(a).  An ADA employment discrimination claim is subject to the burden-shifting framework established in McDonnell Douglas Corp. v.

8

Green, 411 U.S. 792, 802 (1972).  See McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).

Under McDonnell Douglas, once a plaintiff makes out a prima facie case of retaliation or discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802-03.  If the defendant produces evidence of such a reason, the plaintiff must point to evidence sufficient to permit a rational factfinder to conclude that the defendant's reason is merely a pretext for discrimination or retaliation. Id. at 803-04; see also Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003) (summarizing McDonnell Douglas similarly).

In the context of the ADA,

> to establish a prima facie case . . ., a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

McMillan, 711 F.3d at 125 (citation omitted) (emphasis added).

Although "[a] plaintiff's burden at th[e] prima facie stage is de minimis," Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted) (in the context of an ADA retaliation claim), "[s]tray remarks, even if made by a

9

decision-maker, do not constitute sufficient evidence [to support] a case of employment discrimination." Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998). "[O]ther indicia of discrimination" must be "properly presented" for the claim to survive summary judgment. Id. The Second Circuit has described the standards by which district courts are to determine whether remarks are "stray," rather than indicative of discriminatory intent, as follows:

> The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be.

Henry v. Wyeth Pharma., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (citation omitted). Thus, courts consider four factors to determine whether a remark is probative:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Id.

If the prima facie case is met, the court turns to the second and third part of the McDonnell Douglas framework:

whether defendant has asserted a legitimate, nondiscriminatory rationale, and whether plaintiff can demonstrate this rationale to be pretextual.  Summary judgment may be granted if the plaintiff "has not pointed to any record evidence indicating that [the defendant's] legitimate reason for the alleged adverse employment action is a pretext."  Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 188 (2d Cir. 2006); see also Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (granting summary judgment because plaintiff's argument did not raise a genuine issue of material fact that "warrant[ed] a jury trial").

Summary judgment is granted to Middletown.  Assuming for present purposes that Greene has met the first three prongs of establishing her prima facie case of disability discrimination, Greene has failed to meet the fourth prong.  Even taking all inferences in favor of Greene on the undisputed facts -- i.e., accepting for present purposes that Greene performed her duties well and that her unfavorable reviews from her supervisors were unfounded -- Greene has failed to point to any evidence raising an inference that her discharge was because of her disability.

Greene's sole argument for why she has established a prima facie disability discrimination claim is to point to Dr. Eastwood's "poor woe is me type" statement during the April 13, 2011 meeting.  Under the standards set forth above, this is a

11

"stray remark" that is insufficient to establish a prima facie case of discrimination. The comment itself is "remote and oblique." Henry, 616 F.3d at 149. It does not specifically reference her disability, even when considered in conjunction with the assertion that Dr. Eastwood glanced at Greene's amputated limb when he said it. Rather, it is a statement that refers far more directly to the long history of discord between Greene and her supervisors, and Greene's repeated protests that her discharge is groundless. The comment does not "evince[] a discriminatory state of mind." Id.

As significantly, the comment is remote with respect to the alleged adverse action. While Dr. Eastwood is a decision-maker, it is undisputed that his recommendation to discharge Greene rested on the many unfavorable evaluations issued by Tuttle and Creeden. Accordingly, to the extent that Greene claims that her discharge was the product of disability discrimination, she should also point to evidence that Tuttle and Creeden discriminated against her on the basis of her disability in issuing these unfavorable evaluations. See Nagle v. Marron, 663 F.3d 100, 117-18 (2d Cir. 2011) (discussing such a requirement under the related "cat's paw" doctrine in discrimination cases). There is no such evidence in the record here. While Greene testified that she assumed they were discriminating against her,

that assumption does not raise a question of fact that either Tuttle or Creeden harbored a discriminatory animus. As such, no "reasonable juror could view [Dr. Eastwood's] remark as discriminatory." Henry, 616 F.3d at 149.

In disputing the conclusion that Dr. Eastwood's remark was "stray," Green cites three district court cases. In each of these cases, however, the remark at issue was direct evidence of the alleged form of the discrimination. Savino v. Town of Southeast, 11 Civ. 483 (NSR), 2013 WL 5730043, at *3 (S.D.N.Y. Oct. 21, 2013) ("You Guineas think you can get away with anything" in an Equal Protection national origin case); St. Louis v. New York City Health & Hosp. Corp., 682 F. Supp. 2d 216, 226 (E.D.N.Y. 2010) ("[Defendant] did not like working with females" in a Title VII gender case); Silver v. North Shore Univ. Hosp., 490 F. Supp. 2d 354, 356 (S.D.N.Y. 2007) ("[L]et's face it, we're both almost 60 years old, right?" in an ADEA case). Here, by contrast, the remark was both oblique and remote from the alleged adverse action.

Even if Greene had presented sufficient evidence to raise a question of fact regarding the existence of a prima facie case of discrimination, the defendant has presented a legitimate, non-discriminatory basis for terminating Greene's employment. Dr. Eastwood's letter listed thirteen reasons or incidents

13

justifying the decision.  Greene disagrees with the accuracy of many of the reasons given by Dr. Eastwood for his decision, but she has not offered evidence from which a rational jury could conclude that the reasons were a pretext for disability discrimination.

CONCLUSION

   Defendant's December 13, 2013 motion for summary judgment is granted.  The Clerk of Court shall close the case.


   SO ORDERED:

Dated:    New York, New York
          April 29, 2014

_____
DENISE COTE
United States District Judge